UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

N.F. by his parents
     Plaintiff,

v.                            C.A. No. 11-177-ML

CHARIHO REGIONAL SCHOOL DISTRICT
     Defendant

## MEMORANDUM AND ORDER

This case is brought by N. F., through his parents[1], Mr. and Mrs. F. (together with N.F., "Plaintiffs"), pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"). The Plaintiffs seek reversal of the Administrative Decision (the "Decision") of an Impartial Due Process Hearing Officer (the "Hearing Officer"). On its part, the Chariho Regional School District (the "School District") seeks an order upholding the Hearing Officer's determination that the School District proposed an appropriate clinical placement for N.F. "to address his unique needs in the areas of sensory processing skills, behavioral skills, and emotional issues, in addition to his academic needs." Decision 2.

The matter is now before the Court on the parties' cross-

---

[1]

    It is evident from the administrative record and the filings and pleadings that N.F.'s mother (hereinafter referred to as the "Parent") has been the primary driving force and active participant in this case.

1

motions for summary judgment on the complaint. For the reasons that follow, the Plaintiffs' motion for summary judgment is DENIED and the School District's motion for summary judgment is GRANTED.

## I. Factual Background[2]

N.F. was placed into foster care with Mr. and Mrs. F. shortly after his traumatic birth to a woman with a history of drug and alcohol use. At age three months, N.F. was adopted by Mr. and Mrs. F. Initially, N.F. achieved developmental milestones on time, although he had some gross motor delays and he had difficulties being soothed as an infant. Decision 18.

N.F. attended preschool, where he demonstrated some behavioral difficulties, including aggressive outbursts. He then attended kindergarten at Kingston Hill Academy ("Kingston Hill"), during which time he was treated by Psychiatrist Dr. Robin with Risperdal for aggressive outbursts. The Parent also sought an evaluation of N.F. at Memorial Hospital, which consisted of "behavioral observations . . . a neurological evaluation, and development tests in the cognitive and theory of mind assessment areas." Decision 18. Memorial Hospital concluded that N.F. had strong cognitive and memory skills, but that he had difficulties with motor

---

[2]
    This summary is based primarily on the Hearing Officer's Findings of Fact as supported by the transcripts of the due process hearing and the exhibits submitted by the parties. Any significant disagreements by either party in their respective statements of undisputed facts are noted. Neither party has submitted a statement of disputed facts pursuant to Local Rule LR Civ 56(a)(3).

restlessness, impulse control, and expressive language. N.F. was diagnosed with ADHD (Attention Deficit Hyperactivity Disorder) combined type, for which Memorial Hospital recommended speech/language evaluation, appropriate medication, and parent counseling. Decision 19.

N.F. completed kindergarten at Kingston Hill but did not return for first grade. The Hearing Officer noted in her Decision that, although the Parent denied that N.F. was asked not to return to Kingston Hill, other evidence in the record suggested that the school felt it could no longer meet N.F.'s needs. Decision 19-20.

With the School District's approval, the Parent home-schooled N.F. during the '08/'09 school year in order to have him evaluated and stabilized. During that time, N.F. was evaluated by Dr. Monarch at Gershon Psychological Associates. In addition, reviews were conducted of Memorial Hospital's Speech/Language evaluation, Kingston Hill's behavior assessment and progress reports, and education observations by the School District. Decision 20. The evaluation showed that N.F. had difficulties with emotional and behavioral regulation, oppositionality, and aggression. N.F.'s diagnosis was Oppositional Defiant Disorder ("ODD") with the possibility of an undiagnosed sensory processing disorder. It was noted that, because N.F.'s health might have been compromised by the biological mother's drug/alcohol abuse, his genetic risk factors were unknown. Recommendations included occupational

3

therapy ("OT") and physical therapy ("PT") evaluations, continued speech therapy, monitoring by a neurologist, in-home services for the parents with a family therapist, special education services, additional classroom accommodations, individual or group social skills training, monitoring symptoms of a mood disorder, and assistance for the parents to address N.F.'s sleep difficulties. Decision 21.

In March '09, the Parent had N.F. evaluated at the Southeastern Connecticut Therapy and Wellness Center, where it was recommended that N.F. receive six weeks of PT to increase overall strength, balance, coordination and advanced gross motor activities. No standardized testing was done on that occasion, however. Id.

Around that time, the Parent contacted the School District to discuss a possible return of N.F. to public school the following Fall. The School District referred N.F. for clinical psychological evaluation, which was completed in April '09 by Dr. Elizabeth Cantor ("Dr. Cantor"). Dr. Cantor concluded that N.F. did not meet the criteria for Pervasive Developmental Disorder or ODD, but that his mood difficulties should be monitored for a possible mood disorder. Decision 22. Her recommendations included developing a positive behavior plan in N.F.'s new, structured classroom, accommodations for transitions and changes, using information regarding his sensory functioning, and monitoring his symptoms

4

through ongoing communication with the home, prescribing physician, and school. Id.

After a meeting of the Parent with the School District staff, N.F. was found eligible for special education and related services. The School District also agreed to let N.F. repeat the first grade, as the Parent had requested. In September 2009, N.F. began attending Charlestown Elementary School in a regular classroom. Because the Parent wanted to wait until N.F.'s classroom teacher had been assigned, an IEP (Individualized Education Program) was not developed until October 2009. Decision 23. The IEP, to which the Parent consented, included regular classroom placement with language therapy, OT, special education consultation and other accommodations. N.F. also had a behavior plan. Decision 23.

In February 2010, after N.F. was suspended from school for behavioral issues, the Parent asked for another IEP meeting to discuss her request for an individual teacher assistant ("TA"). The IEP team decided to gather behavioral data for six weeks - an individual TA would be assigned to perform this task - before making a determination regarding the Parent's request. The Parent, convinced that her own data collection was sufficient, complained to the Superintendent of Schools about the IEP Team's decision, as well as the perceived demeanor of Special Education Director Kathleen Perry ("Mrs. Perry") towards her. Decision 23.

On March 3, 2010 (before the six weeks evaluation could be

conducted), the Parent withdrew N.F. from school to home-school him again for the remainder of the school year. In her written request to the Superintendent of Schools to homeschool N.F., the Parent expressed her opinion that N.F.'s "sensory integration issues" which she considered "essential to his academic progress," "would never be addressed through Chariho School District." Decision 23, Plft.'s Ex. 46.

In the Spring of 2010, the Parent visited the RYSE School.[3] According to the Parent, although she described her visit as "extraordinarily limited," she "found it to be inappropriate for elementary school children" and "not environmentally sound for my son." Tr. II 66:2-12. She also described it as "a placement, almost a warehouse, if you will, for emotionally disturbed children." Tr. II 67:16-18.

While N.F. was being homeschooled, the Parent had him evaluated by Dr. Yvette Yatchmink ("Dr. Yatchmink") at Hasbro Children's Hospital. Dr. Yatchmink diagnosed N.F. with developmental coordination disorder, phonological language

---

[3]
The Hearing Officer's Decision contains a detailed description of the RYSE [Reaching Youth through Support and Education] program. Decision 39. The RYSE program provides two separate programs in a public school setting: an alternate learning program at the middle and high school level, and a clinical day program providing special education for students in Kindergarten through Grade 12. Services include individualized programming, in-school therapeutic support, mental health service, case management, positive behavioral programming, and "small structured classrooms with a low pupil-teacher ratio." Id.

disorder, a sensory processing disorder, and emotional behavioral regulation disorder with a possible emerging mood disorder. Decision 24, Pltfs.'s 18. Dr. Yatchmink noted that N.F. was receiving speech and language interventions as well as OT and PT on an outpatient basis. She further stated that "[N.F.] is currently being home schooled, but I do believe that it is essential for him to have an academic placement that is able to support his educational and emotional needs. [N.F.] needs a school program that provides therapeutic support within the academic environment." Pltfs.' Ex. 18, Page 2 of 3.

Following this evaluation by Dr. Yatchmink, the Parent requested another IEP meeting. The IEP Team met with the Parent and her consultant, Dr. Kathleen O'Connor ("Dr. O'Connor"), on June 8, 2010. Together, the parties reviewed Dr. Yatchmink's report, and discussed various options to accommodate N.F.'s needs. Decision 25. No conclusion was reached and a second meeting was held on June 17, 2010. As before, the Parent requested that her concerns be included in the meeting minutes, *e.g.* that RYSE does not have a playground, and that N.F. was already being evaluated privately. It was decided that, over the summer, N.F. was to (1) receive compensatory OT services, (2) be provided with an AlphaSmart,[4] and (3) begin "assistive technology screening" to

---

[4]

A keyboarding device frequently used by individuals with writing disabilities.

identify areas of concern. The Parent was to meet with the School Principal and special education administrators to plan N.F.'s possible return to school. Decision 26-27, Pltf.'s Ex. 34, 3 of 4.

Although OT was offered by RYSE, the Parent requested money to pay for privately arranged OT. The School District agreed, on condition that the services were documented and in concert with the IEP. The Parent, however, decided not to avail herself of either option and no OT was provided to N.F. during the summer. Decision 27.

On August 4, 2010, N.F. was hospitalized at Bradley Hospital for "increasing aggression and out-of-control behavior." An August 16, 2010 letter to Mrs. Perry from Mandy Witkin ("Witkin"), a Clinical Social Worker at Bradley Hospital ("Bradley"), contains a number of conclusions about N.F. based on various records provided by the Parent (excluding, however, the School District's 2009 Clinical Psychological Report). Witkin stated, *inter alia*, that N.F. presents complex difficulties, including learning disabilities and severe behavioral and emotional dysregulation. She also noted that, although N.F.'s behavior had stabilized in the highly-structured inpatient setting at Bradley, "he is not able to function effectively in a non-clinical setting." Pltf.'s Ex. 16, Decision 28. Further, the letter made specific suggestions regarding N.F.'s required educational needs, including the makeup and training of a multi-disciplinary team to work with N.F.

Decision 28. A second letter from Bradley Hospital dated September 15, 2010, nearly identical to the first correspondence, added ADHD combined type to N.F.'s diagnosis. Bradley recommended OT, PT, speech therapy, medication management, and social skills training. In addition, this letter stated that, if N.F. "is not provided with a placement with the high level of clinical support described . . . [he] is at significant risk for requiring a placement in residential level of care." Pltf.'s Ex. 19, Decision 28.

On September 16, 2010, the IEP Team met to review the Bradley Hospital recommendations; Bradley staff participated via teleconference. On that occasion, the IEP Team described the services available at RYSE, including home-based services not available from Bradley Hospital. The Parent expressed discomfort with the RYSE program and requested a referral to the Bradley School. It was agreed that the IEP needed revision and that the IEP team would reconvene once a date for N.F.' discharge from Bradley Hospital had been set.

On October 1, 1010, N.F. was discharged from Bradley Hospital[5]. He began school at RYSE on October 7, 2010.[6] The Parent

_____

[5]
According to the Parent, the Bradley Clinical Social Worker informed her that Mrs. Perry was invited to the discharge meeting but refused to attend - a charge that was not further substantiated and which Mrs. Perry categorically denied. Decision 30-31.

[6]
N.F. was placed into an elementary classroom for five children staffed by a classroom teacher and a Behavior Management Assistant.

picked him up at lunch time, in accordance with her own "transition plan." Decision 31. When the RYSE Social Worker ("Mrs. Cronin") contacted the Parent the following day to discuss RYSE mental health services, the Parent refused to have Mrs. Cronin come to the house and insisted on meeting at a Dunkin Donuts. The Parent explained that she had an acrimonious relationship with the District. At the meeting, the Parent told Mrs. Cronin that she did not want RYSE home-based services because she was already getting them from an outside provider. Decision 31.

While N.F. was attending the RYSE Program, communication between the Parent, the classroom teacher, and the Behavior Management Assistant occurred daily, first by telephone, later, at the suggestion of the Parent, via a daily log. Decision 31.

On October 22, 2010, N.F. had to be restrained at school. Although he had been restrained before at Bradley Hospital and at Butler Hospital, this was the first time he had been restrained in a school setting. The Parent, who had previously voiced her disagreement about the length of "time-outs" at RYSE, called various RYSE administrators to inform them that she intended to pull N.F. back out of school. With the Parent's consent, RYSE staff immediately developed a protocol for time-outs to be used until the next IEP meeting. Decision 32, Pltfs.' Ex. 27.

N.F. returned to school on October 26, 2010. Following two good days at school, N.F. had another time-out and had to be

10

restrained for disruptive behavior. On October 31, N.F. was hospitalized for a "major meltdown," and he remained at Butler Hospital for a month. Decision 32.

On November 5, 2010, the RYSE Team met to develop the annual IEP for N.F.[7] The student's academic strengths and needs were reviewed. The Parent provided a list of services she wanted to be included in the new IEP, including her own Behavior Plan. OT consultation was to be continued. The team developed N.F.'s goal in the area of coping skills and noted that he had received five time-outs in three weeks of school. N.F. was also to receive language therapy on a twice weekly basis. Pltf.'s Ex. 37. N.F.'s Behavior Plan was to consist of his "daily documentation sheet and the time-out protocol." Decision 33.

The 11/05/10 team meeting minutes reflect that the Parent "has indicated that she is not interested in receiving clinical services through the RYSE program. She has outside providers and does not want to address these services at this time." Pltf.'s Ex. 36.[8]

---

[7] In her Statement of Undisputed Facts ("SUF"), the Parent alleges that "[t]he IEP had been prepared prior to the meeting, and at the conclusion of the meeting the parents were told that the IEP as presented would be implemented." Pltf.'s SUF ¶ 71. This assertion is entirely unsubstantiated and in direct conflict with the Hearing Officer's Findings of Fact and the 11/05/10 meeting notes, which set forth, in some detail, the development of the IEP.

[8] The Parent asserted at the due process hearing that she did, in fact, indicate that she was interested in receiving those clinical services. Decision 34. It is undisputed that no consent form was ever signed and that the Parent's assertions were

Disagreement existed with respect to time-out procedures. The Parent requested that a psychologist and nurse monitor N.F. during time-outs, whereas the team took the position that N.F. was adequately monitored by the trained Behavior Management Assistant. Id. The Parent refused to give copies of documents she used during the meeting to Mrs. Perry and she rejected Mrs. Perry's offer to attend the discharge planning meeting at Butler Hospital. Decision 34. As a result, the School District was not represented at the discharge planning meeting. A synopsis the Parent received from Butler Hospital at that meeting was not provided to the School District until the due process hearing had begun. Id.

On November 30, 2010, N.F. was discharged from Butler Hospital with a primary diagnosis of Mood Disorder, Developmental Coordination Disorder, Developmental Language Disorder, Other Specified Childhood Psychoses, and ADHD. Decision 34-35. N.F. was treated with various medications, but continued to have difficulties and aggressive outbursts. He was discharged on four medications and with recommendations for home-based services, psychiatric follow-up and a return to school on a gradual basis. Id. 36.

On December 2, 2010, N.F. returned to school part-time with a

_____

inconsistent with testimony by Mrs. Perry and with the 11/05/10 meeting notes.

transition plan provided by the Parent,[9] who also specified that
any time-outs should be limited to no more than 20 minutes. Id.
On December 23, 2010, a Physical Therapy Evaluation was performed
pursuant to the 6/17/10 IEP conference recommendation.[10] The
Physical Therapist concluded that N.F.'s needs could be
accommodated and addressed by the Physical Education Teacher and
that no direct physical therapy was recommended. Id. After three
full days at school, N.F. had to be restrained for disruptive
behavior. Decision 37. N.F. returned to RYSE after the holidays,
but had to be restrained again on January 4 and 6, 2011. Id.
According to the Plaintiffs' SUF, N.F. was repeatedly hospitalized
in 2011. He is currently residing at the Exeter House in Exeter
and is attending school in the Exeter-West Greenwich School System
in a therapeutic small classroom setting.

## II.  **Procedural History**

On November 15, 2010, the Parent filed a request for a due
process hearing pursuant to the Rhode Island Regulations Governing
the Education of Children with Disabilities (2010) (the "Rhode
Island Regulations"), Sections 300.507-511, 300.521, 300,525.-526,
and 300.528 (providing for Procedural Safeguards Due Process

---

9

The Parent placed her transition plan into N.F.'s backpack for
RYSE staff to follow.  Decision 36.

10

The delay was explained as the result of N.F.'s repeated
absences from the school setting, where such evaluation had to be
performed.

Procedures for Parents and Children). Decision 9. The Parent alleged that the School District was not providing a FAPE [Free Appropriate Public Education] to address N.F.'s unique needs and she sought public funding for the cost of education placement in either a clinical, residential or day treatment out-of-district facility. Pltfs.' Ex. 1. Following a pre-hearing conference on December 14, 2010, eleven days of hearings were held before the Hearing Officer between January 20, 2011 and February 18, 2011. Id. On April 5, 2011, the Hearing Officer issued a 60-page written decision in favor of the School District. The Hearing Officer found that the District proposed an appropriate clinical placement for N.F. She also determined that N.F. required additional evaluation and that the current program was providing adequate communication with N.F.'s parents. Further, the Hearing Officer deemed the RYSE facility appropriate for N.F.'s needs and she concluded that, under the circumstances, the clinical program at the Bradley School was not appropriate for N.F. Decision 2.

On May 2, 2011, the Plaintiffs filed a complaint against the School District pursuant to 20 U.S.C. § 1415(i)(2)(A).[11] The

_____

[11]20 U.S.C. § 1415(i)(2)(A) provides:

Any party aggrieved by the findings and decision made under subsection (f) [impartial due process hearing] . . . who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a

Plaintiffs stated that they appealed from the Hearing Officers' Decision because it was not supported by the evidence presented and that they wished "to supplement the record with additional evidence of diagnosis, need and treatment subsequent to the hearing dates." Complaint ¶¶ 7, 8.

In a Rule 16 conference on September 7, 2011, the Court informed the parties that it would not permit supplementation of the administrative record with evidence related to <u>events that occurred prior to the due process hearing</u> which had not been submitted to the Hearing Officer and considered by her in arriving at the Decision. On November 7, 2011, the parties filed cross-motions for summary judgment. The Plaintiffs, in contravention of the Court's instruction, submitted supplemental evidence of what appears to be a transcript from a partial recording of the November 5, 2010 IEP meeting. On November 23, 2011, Plaintiffs filed a response in opposition to the School District's motion. On November 25, 2011, the School District filed a response in opposition to the Plaintiffs' motion. Both parties filed reply memoranda on December 5, 2011.

---

district court of the United States, without regard to the amount in controversy.

The Court notes that the School District, in responding to the complaint, initially asserted that N.F.'s claims "are barred by the doctrine of exhaustion of administrative remedies." This argument, however, is not further developed in the School District's motion.

## III. Standard of Review

In considering an appeal from a Hearing Officer's Decision under IDEA, the Court reviews the administrative record and "makes an 'independent ruling based on the preponderance of the evidence.'" Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004)(quoting Town of Burlington v. Dep't of Educ., 736 F.2d 773, 790 (1st Cir. 1984)); Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008)("In reviewing the hearing officer's decision, the district court is tasked with determining the IEP's appropriateness on the basis of the preponderance of the evidence."). In its determination, the Court is required to give "due weight" to the findings by the Hearing Officer. Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d at 83 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Because judges, generally, are not trained pedagogues, "they must accord deference to the state agency's application of its specialized knowledge." Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d at 24. "As a result, judicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." Id. See also Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 25 (1st Cir. 2002)(quoting G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 946 (1st Cir. 1991))(noting that, "[while the court must

recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such a finding is ultimately 'left to the discretion of the [examining] court.'").

When, as in this case, the Court decides the case on the basis of the administrative record, the parties' cross-motions for summary judgment serve as a procedural device, in which the burden of proof rests with the party seeking to overturn the Hearing Officer's Decision. See e.g. Linda E. v. Bristol Warren Regal Sch. Dist., 758 F.Supp.2d 75, 87 (D.R.I. 2010); Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 (1st Cir. 1990)(noting that "the burden rests with the complaining party to prove that the agency's decision was wrong.")

The submitted administrative record in this case consists of (1) the Hearing Officer's lengthy written Decision, together with rulings on various motions submitted to her by the parties prior to, or in the course of, the due process hearing; (2) the transcripts of the proceedings before the Hearing Officer, (3) the parties' post-hearing briefs, and (4) the parties' exhibits that were admitted by the Hearing Officer.

**IV. Discussion**

A. IDEA Overview

The purpose of the IDEA is "to guarantee a free and appropriate *public* education [FAPE]." Gary S. v. Manchester Sch.

Dist., 374 F.3d 15, 23 (1st Cir. 2004). The IDEA provides funding to the states in order "to assist them to provide special education and related services to children with disabilities." 20 U.S.C. § 1411(a)(1); Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist., 480 F.3d 1, 4 (1st Cir. 2007). To qualify for such funding, a State must ensure that "[a] free appropriate public education [FAPE] is available to all children with disabilities residing in the State between the ages of 3 and 21..." 20 U.S.C. § 1412 (a)(1)(A). A FAPE is defined as "special education and related services" that, *inter alia*, are "provided at public expense . . . without charge," 20 U.S.C. § 1401(9), and it encompasses "specially designed instruction at no cost to the parents to meet the unique needs of a child with a disability, including . . . instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." 20 U.S.C. § 1401(29)(A). Because, under the IDEA, mainstreaming is preferred, "the goal . . . is to find the least restrictive educational environment that will accommodate the child's legitimate needs." C.G. ex rel. A.S. v. Five Cmty. Sch. Dist., 513 F.3d 279, 285 (1st Cir. 2008).

School systems are required "to identify children who may qualify as disabled, evaluate each such child to determine his or eligibility for statutory benefits, and develop a customized IEP designed to insure that the child receives a level of educational benefits commensurate with a FAPE." C.G. ex rel. A.S. v. Five

18

Cmty. Sch. Dist., 513 F.3d at 285)(citing 20 U.S.C. §§ 1412(a)(3)-(4), 1414(a)-(b)). If a disabled child is not provided with a FAPE through placement at a public school, the school system may be responsible for reasonable costs of a private placement. Id. at 284-285.

The IDEA contains certain procedural safeguards if the state or local educational agency does not follow the procedures set forth in the IDEA. Smith v. Fitchburg Pub. Sch., 401 F.3d 16, 21-22 (1st Cir. 2005). Students and their parents are entitled under the IDEA to request an impartial due process hearing by the local educational authority ("LEA"), 20 U.S.C. § 1415(b)(6), (f)(1), to appeal a decision by the LEA to the state educational agency, and to file a suit against school departments. Doe v. Boston Pub. Sch., 358 F.3d 20, 23 (1st Cir. 2004); 20 U.S.C. § 1415(i)(2).

B.  The Hearing Officer's Decision

The Hearing Officer, after requesting from the Parent a more specific delineation of the issues, framed five agreed upon issues, which she analyzed and decided separately.

First, the Hearing Officer concluded that "[t]he District did propose an appropriate clinical placement for the Student, to address his unique needs in the areas of sensory processing skills, behavioral skills, and emotional issues, in addition to his academic needs." The Hearing Officer explained that "[t]he proposed program does include coordinated instruction and support

19

by adequately trained personnel in all areas of diagnosed need, e.g., psychological, sensory-motor, gross and fine motor, social and academic." Decision 2, ¶ 1.

Second, the Hearing Officer concluded that "[t]he Student does require additional evaluation, *i.e.*, Functional behavioral assessment with a concomitant behavioral intervention plan." Id., ¶ 2. Both parties appear to be in agreement that, when restraints are used for N.F., a Behavior Intervention Plan is required.

Third, the Hearing Officer found that "[t]he current program is providing adequate communication with the parents." Id., ¶ 3.

Fourth, the Hearing Officer concluded that the RYSE facility "is appropriate for the provision of the program needed by the Student." Id. ¶ 4.

Fifth, the Hearing Officer ruled in favor of the District on the question of whether "the clinical program at the Bradley School [is an] appropriate program for the Student." Id., ¶ 5.

The Hearing Officer also noted that a November 2010 Progress Report "indicates that the Student is making progress achieving his annual goals in language, writing and coping/social skills (R-24), and despite his behavior issues, is achieving at or near grade level in reading and math." Decision 48.

C. The Plaintiffs' Position

Essentially, the Plaintiffs disagree and take issue with every aspect of the Hearing Officer's Decision. They allege, *inter*

*alia*, that the Hearing Officer's summary of facts contains legal errors as well as important errors of fact and emphasis. Pltfs.' Mem. 18. They suggest that the Hearing Officer misconstrued parental advocacy as anger; focused on the personality of the parties rather than the needs of N.F.; emphasized the wrong evaluations; failed to address the substance of the 11/05/10 IEP; neglected to address the District's alleged failure to implement several elements of the 11/05/10 IEP; improperly discounted the expertise of mental health professionals at Hasbro, Bradley, and Butler Hospitals; incorrectly and arbitrarily discounted the testimony of the parents' other expert witnesses; and unfairly charged the parents with being uncooperative and hostile.

Apart from this fundamental disagreement with all parts of the Decision, the Plaintiffs make the following discrete assertions: (1) the finding that the mother refused clinical services per se for N.F. at the RYSE school is not accurate. Pltfs.' Mem. 19. (2) The ruling that the 11/05/10 IEP was not a final IEP was erroneous. Id. at 20-21. (3) The 11/05/10 IEP fails to address N.F.'s psychiatric, psychological, social, or emotional needs. Id. at 22. (4) The Hearing Officer dismissed N.F.'s Sensory Disorder diagnosis and his need for sensory activities. Id. at 23. (5) The Hearing Officer's finding that the Bradley School is not appropriate for N.F. is unsupported by the record. Id. at 28.

The Plaintiffs seek a determination by this Court that the School District "has failed to provide an adequate IEP and an

21

appropriate placement for N.F., that N.F. has therefore been denied FAPE, and that N.F. should be entitled to an appropriate out-of-district clinical day or residential program/placement as requested." Id. at 29.

D. The School District's Position

The School District argues that (1) the Parent thwarted the IEP process, Defs.' Mem. at 42; and (2) even if the IEP was technically deficient, it was reasonably calculated to deliver educational benefits. Id. at 47. With respect to the former, the School District points out that the Parent refused to let Mrs. Perry attend discharge meetings from Bradley Hospital and Butler Hospital. As a result, Chariho lacked information that could have helped N.F. transition to the RYSE School. Id. at 42. The School District also cites several examples where the Parent is alleged to have withheld information from the IEP Team.

The School District also maintains that N.F. did not receive clinical mental health services as part of his program because the Parent refused in-school mental health services (by not providing signed informed consent required by the providers of such clinical services). Id. at 43-44. With respect to the alleged lack of the Parent's preferred Behavior Plan, the School District notes that there was a data driven behavior plan based on N.F.'s IEP goals, which would have been modified if N.F. had continued to attend the RYSE School and/or if the Parent had accessed clinical services for N.F. Id. at 46. Regarding the Parent's insistence on sensory

integration therapy, the School District argues that IDEA does not afford parents the right to dictate that certain methodologies be used to educate their children.

The School District also agrees with the Hearing Officer's view of the 11/05/10 IEP as incomplete, particularly when the Parent refused mental health services and repeatedly removed N.F. from school even when he was not hospitalized. Defs.' Mem. 47.

E. Discussion

The Court's task in an appeal from a Hearing Officer's decision is (1) to determine whether the IEP development process complied with the IDEA's procedures, and (2) whether the IEP's substance provided the student with a FAPE. <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley</u>, 458 U.S. 176, 206-207, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). An IEP must contain "information about the child's disabilities, a statement of educational goals, a description of the measures that will be used to determine whether the child has met those goals, and a compendium of special education and related services that will be furnished to the child." <u>C.G. and B.S. v. Five Town Cmt'y Sch. Dist.</u>, 513 F.3d at 285; 20 U.S.C. § 1414(d)(1)(A). However, even if an IEP does not comply with all of the IDEA's procedural requirements, a student is only entitled to relief if that deficiency results in the denial of a FAPE. <u>Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.</u>, 518 F.3d at 23 (noting that "the obligation to devise a custom-tailored IEP does not imply that a

disabled child is entitled to the maximum educational benefit possible.").

The requirement to provide a FAPE is met as long as the program offered by the District is "reasonably calculated" to offer "educational benefits." C.G. and B.S. v. Five Town Cmt'y Sch. Dist., 513 F.3d at 284). It is well established that "[t]he development of an IEP is meant to be a collaborative project." Id. at 285. Roland M. v. Concord Sch. Comm., 910 F.2d 983, 995 (1st Cir. 1990)(noting a reviewing court's inquiry should not be restricted to an incomplete IEP resulting from the parents' obstructionism). See also MM v. Sch. Dist. of Greenville Cty., 303 F.3d 523, 535)(4th Cir. 2002).

In concluding that the School District proposed an appropriate clinical placement for N.F., the Hearing Officer addressed separately[12] those issues which had been identified as the Parent's "most critical issues:" (1) Sensory Disorder, requiring sensory integration therapy; (2) lack of a Positive Behavior Report Plan; and (3) lack of clinical services by adequately trained staff. Decision 40-41.

(1) With respect to Sensory Disorder, the Hearing officer correctly pointed out that Rhode Island Regulations 300.8(c)do not recognize "Sensory Disorder" as a disability and that "there are no

---

[12] A significant part of the Decision is devoted to describing and analyzing the primary objections which the Parent raised in her challenge of the November 5, 2010 IEP. Decision 41-54.

peer-reviewed articles in the psychiatric literature which recognize sensory-integration therapy as being an activity that is used with emotionally disturbed children to improve their educational outcomes." Id. 41. In her determination of this issue, the Hearing Officer noted that she gave high credibility to statements by Dr. Dumas, a Clinical Psychologist with the RYSE program. The record reveals that Dr. Dumas's opinion was based on years of relevant experience, including serving as Director of Evidence-Based Services at Psychological Centers and Director of the ADHD Clinic at Bradley Hospital, and teaching at Brown University School of Medicine in the Department of Psychiatry and Human Behavior. Decision 41.

In contrast, the Hearing Officer gave little or no weight to the three witnesses presented by the Parent: Chelsea Constanineau ("Costanineau"), an Autism Spectrum Disorder Clinician; Debra Dixon ("Dixon"), a Physical Therapist in private practice; and Dr. Kathryn O'Connor ("Dr. O'Connor"), Director of the Connecticut College Children's Program. The Hearing Officer's reluctance to credit the testimony by those three witnesses was well supported by the evidence in the record. Costantineau, who provided home-based family therapy to N.F. and his parents, had not observed N.F. in a school setting, and her work in a school based setting was limited to an internship. Moreover, Constanineu's résumé did not include any education courses dealing with sensory issues, and there was nothing in her testimony or her Treatment Plan that indicated that

anything she did with N.F. at home had been successful. Id. 42. Dixon did not observe N.F. in the classroom (nor did she contact anyone at the school), but observed him at home on one occasion. Although Dixon provided an impressive résumé, the Hearing Officer found "her testimony and report to be very theoretical, and her protocols and recommendations not to be evidence-based." Id. at 43. Rhode Island Regulations, however, require that aids and services contained in IEPs must be based on peer-reviewed research. Id.

Dr. O'Connor is a friend of the Parent and has previously acted as a consultant and advocate on her behalf. She also employs Dixon as a consultant. The Hearing Officer's conclusion that she was completely biased and could not be regarded as credible, was based, in part, on Dr. O'Connor's testimony that she considered the Parent to be the expert. Moreover, Dr. O'Connor acknowledged that she held a bias toward using interventions that address sensory needs and sensory dysregulation. Id. at 44. In addition, Dr. O'Connor was not familiar with Rhode Island Regulations and had only reviewed records provided to her by the Parent. Id.

As the Hearing Officer pointed out, "'[a]ctivities that help students to improve their ability to perform tasks for independent functioning if functions are impaired or lost' fall under the domain of the Occupational Therapist." Id., quoting Rhode Island Regulations 300.34 [Related Services], (6)(ii)(B). The Parent, however, did not present the testimony of an Occupational Therapist

26

but sought, instead, to introduce information about peer-reviewed methodologies from other witnesses. Id. at 44.

(2) With respect to the alleged lack of a Positive Behavior Support Plan, the RYSE staff took the position that it already provided a such a plan in the form of daily updated data collection sheets containing specific goals identified for N.F. at Charlestown Elementary School. The Hearing Officer acknowledged that this was "not in the format the Parent wanted." Id. at 45. The Hearing Officer also noted that, although the Rhode Island Regulations only require Behavior Support Plans (Behavior Intervention Plans) when a student is removed from school, it is not unusual for students with mental health needs or placed in special education programs, to have such a plan. Id. The Parent did not agree with the methods used by RYSE staff, e.g. for time-outs, and produced her own modified behavior plan, which she wanted included in the 11/05/10 IEP. As the Hearing Officer correctly stated: "IDEA does not ensure that a FAPE will consist of the precise plan that the parent desires." Id. at 46 (citing Shaw v. Dist. of Columbia, 238 F.Supp.2d 127, 139 (D.D.C. 2002)). Moreover, the testimony by Mrs. Perry supported the School District's contention that, if the Parent were to consent to clinical services provided by RYSE, a behavioral intervention plan would be made part of N.F.'s treatment plan. Id.

(3) Regarding the Parent's allegation that the RYSE clinical services staff were inadequately trained, the Hearing Officer

27

listed the RYSE clinical staff and noted the staff members' respective qualifications, including Dr. Dumas (President of Behavioral Health Solutions and a Ph.D. Psychologist), Jane Cronin (Master's Level Clinician, completing her license as a Licensed Mental Health Counselor), another doctoral level clinical psychologist, another master's level clinician, a bachelor's level case manager, and trained behavior management assistants.

The Hearing Officer's conclusion that the staff members were "adequately trained and supervised and that they support the classroom teacher and other school personnel in a coordinated manner, through bi-weekly (or more often, if needed) team meetings, and daily consultation," Decision 47, was thus adequately supported by the evidence of the RYSE staff's qualification. In addition, for all students whose parents consented to the clinical services program, "families are supported on a 24/7 basis throughout the calendar year, through frequent contact with the master's clinicians who also coordinate the school-home partnership." Id. 47-48.

N.F.'s classroom teacher was RIDE (Rhode Island Department of Education) certified and received daily support from clinical services staff. Likewise, Mrs. Perry, the Special Education Director, is state certified in special education administration, elementary and middle school principal, school psychologist and special education teacher Kindergarten through Grade 9, has presented peer-reviewed research and holds a bachelor's degree in

28

special education/elementary education/psychology, a Masters Degree in educational psychology, and a Certificate in Advanced Graduate Study in School Psychology. Decision 49. In sum, the evidence submitted to the Hearing Officer supported a conclusion that the proposed program for N.F. included coordinated instruction and support by adequately trained personnel in all areas of diagnosed need. Id.

The Hearing Officer also discussed in detail that the proposed program for N.F. did not include a clinical services component because there was no signed consent by the Parent. Although it was made clear to the Parent that written consent was required, the Parent took the position that she gave verbal consent for clinical services in school, but not at her home, an assertion with which the staff disagreed.[13] The Hearing Officer noted that "[a]s a matter of record, the clinical services continued to be offered to the Parent, but the offer was not considered." Decision 50. The Parent provided no evidence that Bradley Hospital's stated personnel and service requirements for N.F. (with the exception of medical management services that are not required

---

[13]

At the due process hearing, the Parent claimed that the 11/05/10 IEP team meeting notes mis-stated what she had said. Although she had not corrected those notes as she had done on an earlier occasion, she claimed that she had taped the meeting, but was unable to produce the tape. The Hearing Officer inferred that the Parent's inability to produce the tape was suspect. Decision 50. The Parent now belatedly seeks to supplement the Administrative Record with what appears to be an unverified, incomplete transcript of said tape.

29

under the Rhode Island Regulations) could not also be provided in the RYSE program. Under those circumstances, it was not an unreasonable inference by the Hearing Officer that the two letters from Bradley Hospital to Mrs. Perry prior to the September 10, 2010 IEP meeting served as a "thinly veiled strategy to force a Bradley placement." Id. at 51.

The Hearing Officer also spent some time detailing the differences of opinion between the Parent and staff members, which made it "difficult to establish a working relationship between the two." Decision 52. The Parent asserted that the RYSE staff ignored Bradley Hospital's recommendations at the 11/05/10 IEP meeting and she refused to agree to the program unless it contained sensory-integration therapy and other services. The RYSE staff took the position that it could provide the recommended services, provided the Parent gave signed informed consent for the clinical services. Id.

The Hearing Officer correctly noted that, "[a]lthough the IDEA guarantees a FAPE, this does not mean that this education will be designed according to the parent's preference." Id. at 53. While the School District acknowledged that N.F. required clinical services (which it continued to offer), the Hearing Officer's ultimate conclusion that the 11/05/10 IEP plan did afford an educational benefit to N.F. was also supported by the evidence in the case. See Progress Report, Defs.'s Ex. 23.

With respect to a Behavior Intervention Plan for N.F., the

30

Hearing Officer noted that, while N.F.'s need for such a plan had been acknowledged by Mrs. Perry, functional behavioral assessment of N.F. still needed to be completed. Decision 54. The School District had been collecting data since N.F. began attending the RYSE program; however, the data collection was repeatedly interrupted by N.F.'s many hospitalizations. Moreover, parental consent was necessary to include the clinical services component of the process, but that had not yet been provided. Under those circumstances, it was reasonable for the Hearing Officer to conclude that the School District could not be faulted for not completing the process. Decision 55.

The Hearing Officer's determination that the RYSE program provided adequate communication with the Parent was also supported by the evidence in the record. Communication between the Parent and staff included a daily log (as suggested by the Parent), telephone calls, letters, notes, and face-to-face meetings. Decision 55.

The Hearing Officer noted that, while the Parent's communication with the classroom teacher appeared to be good, the relationship between the Parent and other staff members was described as strained and even "acrimonious." Id. The Hearing Officer also noted that the Parent "attempts to control the methodology of the program" and that she repeatedly complained to the Superintendent about Mrs. Perry, whom she describes as acting "cold" towards her. Those findings are all well supported by the record, and the Parent's own testimony is entirely consistent with

31

that characterization. Notwithstanding the difficulties between the Parent and staff, the Hearing Officer's conclusion that the staff had attempted to accommodate the Parent's request in a professional manner, id. at 56-57, is exemplified in the way the staff incorporated a number of the Parent's suggestions into N.F.'s program, i.e., the daily log and certain techniques to help calm N.F. down during a crisis.

The Hearing Officer's determination that the RYSE facility is appropriate for N.F.'s needs is likewise supported by the evidence in the record. As the Hearing Officer pointed out, the Rhode Island Regulations have no particular requirements for facilities housing programs for children with disabilities. Decision 57. The Parent's criticism regarding use of the facility for older children for Multi-Systemic Therapy[14] was based on an erroneous assumption that there are juvenile delinquents in the RYSE building. The Hearing Officer also addressed the Parent's complaint that the RYSE facility did not have the necessary appropriate space for N.F.'s program by listing all the available areas in the building as well as access to other elementary schools. In addition to the standard size elementary classroom,

---

[14] Multi-Systemic Therapy, or MST, was described by Dr. Dumas as a "community-focused, ecologically-oriented service delivery model designed to provide services to children, adolescents, and their families." Tr. IX, 82:11-17. Dr. Dumas noted that MST was supported by ongoing research "showing the effectiveness of MST in general." Id.

which accommodates only five students, the RYSE facility includes four multi-purpose common rooms, six time-out rooms, as well as staff offices that double as therapy rooms. Although there is no playground, the students have access to fields and recreational areas and the middle school gymnasium. Decision 58. As such, the Hearing Officer's determination is well supported by the evidence in the record.

Finally, the Plaintiffs argue that the Hearing Officer was mistaken in finding in favor of the School District on the question of whether the clinical program at the Bradley School would be an appropriate program for N.F. They correctly point out that the School District stipulated that, "should the Hearing Officer rule in favor of the Petitioner,. . . the Bradley School is an appropriate program for the Student." Decision at 59 (emphasis added). However, the Hearing Officer determined that, because the District "has the capacity to provide, and has offered an appropriate program" for N.F., the Parent's request for placement of N.F. at the Bradley School should be denied. Decision at 59 (noting that "parental preference alone cannot be the basis for [compelling] a school district to proved a certain educational plan for a child").

As noted before, the Plaintiffs have raised a number of specific objections in their appeal of the Hearing Officer's Decision. They disagree with the Hearing Officer's finding that the Parent refused clinical services at the RYSE School *per se.*

33

It is undisputed that the Parent did not sign a consent form and the evidence submitted to the Hearing Officer supported the School District's contention that the Parent declined clinical services offered through the RYSE program. Although there was some suggestion that the Parent was not presented with a consent form at the 11/05/10 IEP meeting, her own testimony at the due process hearing indicated that, even if she had been presented with the form, she was not sure that she would have signed it.

With respect to the Hearing Officer's ruling that the 11/05/10 IEP was not final, the Hearing Officer determined that, although the parties were in agreement that clinical mental health services were needed, such services could not be provided as part of the 11/05/10 IEP because no written consent had been given by the Parent. Moreover, the undisputed testimony by Mrs. Perry indicated that the School District remained willing to provide clinical services to N.F. as part of his IEP beyond the 11/05/10 date. In other words, the IEP was incomplete because, without the Parent's written consent, a necessary component of the IEP - which the School District was willing and able to provide - could not be included.

The Plaintiffs' general assertion that the 11/05/10 fails to address N.F.'s psychiatric, psychological, social, or emotional needs was addressed in detail by the Hearing Officer in her Decision, Decision 40-54. The Plaintiffs provided no convincing

evidence to the contrary. With respect to the Parent's focus on N.F.'s Sensory Disorder diagnosis, the Hearing Officer's reasoning why she gave little weight to the testimony of the Parent's witnesses was amply supported. Moreover, the Hearing Officer afforded the Parent an opportunity to submit testimony by an OT expert, of which she did not avail herself. Decision 41-44. Likewise, the allegation that RYSE staff is unqualified and inadequately trained is refuted by the evidence in the record. Moreover, it appears that, even with the interruption of his schooling, N.F. showed some positive attainment of skills through his attendance of the RYSE Program. Decision 36, Defs.' Ex. 23.

It is correct that the School District stipulated that the Bradley School would be an appropriate placement for N.F. However, an alternative placement is indicated under the IDEA only if no such placement can be provided in a public school setting. <u>C.G. ex rel. A.S. v. Five Cmty. Sch. Dist.</u>, 513 F.3d at 284-285. ("If a school system is unable to furnish a disabled child with a FAPE through a public school placement, it may be obliged to subsidize the child in a private program.") Because the Plaintiffs did not meet the burden of establishing that the School District denied a FAPE to N.F., placement at the Bradley School was not appropriate and the Hearing Officer correctly found for the School District on that question.

## V. Summary

Based on a thorough review of the administrative record and consideration of the parties' respective arguments, this Court finds that the Hearing Officer's Decision in favor of the School District is supported by a preponderance of the evidence. In this case, the School District agrees with the Parent that N.F. is in need of clinical mental health services as part of a complete IEP. The School District offered to provide such services as part of the 11/05/10 IEP and it also indicated its willingness to add such services at any time, provided the Parent gave the necessary written consent. The Parent, however, failed to give her consent to such services. In other words, by refusing the necessary clinical mental health services offered by RYSE, the Parent effectively precluded the School District from finalizing and implementing a complete and appropriate IEP. Moreover, the record contains numerous examples where the development of a complete IEP was frustrated by the Parents' lack of cooperation. *Inter alia*, the Parent withdrew N.F. from school before an assessment of his need for an individual TA could be completed; she failed to include the School District's 2009 Clinical Psychological Report for evaluation by Bradley Hospital; she refused Mrs. Perry's attendance at the discharge meeting at Butler Hospital; she refused a home visit by the RYSE social worker; and she did not provide the School District with the Butler Hospital synopsis until the due process

36

hearing was underway. In such circumstances, the Plaintiffs have not met their burden of proving that the Hearing Officer's Decision was erroneous.

## VI. Conclusion

For the reasons stated above, the Defendants's motion for summary judgment is GRANTED, the Plaintiffs' motion for summary judgment is DENIED, and the Hearing Officer's Decision is AFFIRMED.


SO ORDERED.

/s/ Mary M. Lisi

Mary M. Lisi
Chief United States District Judge
March 1, 2012